UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE HURSTON, o/b/o I.B.,

                Plaintiff,             Civil Action No. 12-12288
                                        Honorable Marianne O. Battani
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 17]

Christine Hurston ("Hurston") brings this action on behalf of her minor son, I.B. ("Plaintiff"),[1] pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 17], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the Act is not supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [17] be DENIED, Plaintiff's Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of

---

[1] For convenience, the Court will refer to I.B., the minor child, as "Plaintiff" throughout this brief, although his mother, Christine Hurston, is the named plaintiff in this action.

benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.    REPORT

### A.    Procedural History

On January 12, 2009, an application for SSI was filed on behalf of Plaintiff, alleging a disability onset date of September 1, 1998.  (Tr. 136-38).  This application was denied initially on April 9, 2009.  (Tr. 70-73).  A timely request for an administrative hearing was filed on Plaintiff's behalf, and a hearing was held on November 4, 2010, before ALJ Henry Perez, Jr. (Tr. 33-68).  Both Plaintiff and his mother appeared and testified at the hearing, represented by attorney Elizabeth Warren.  (*Id.*).  On November 24, 2010, the ALJ issued a written decision finding that Plaintiff is not disabled.  (Tr. 12-25).  On March 22, 2012, the Appeals Council denied review.  (Tr. 1-5).  On behalf of Plaintiff, Ms. Hurston filed for judicial review of the final decision on May 24, 2012.  (Doc. #1).

### B.    Background

#### 1.    *Disability Reports*

Plaintiff was born in February of 1997, making him eleven years old at the time his application for disability benefits was filed.  (Tr. 150).  In an undated disability report, Ms. Hurston reported that Plaintiff suffers from "learning disabilities" and asthma and first became disabled on September 1, 1998.  (Tr. 158).  Ms. Hurston indicated that Plaintiff had seen physicians regarding his asthma, and he also saw a school counselor for his learning disabilities and "help with self esteem."  (Tr. 158-61).  At the time of the report, Plaintiff was not taking any medications.  (Tr. 162).  He had undergone several tests between 2006 and 2009, including a hearing test, vision test, breathing test, and speech/language test.  (Tr. 162-63).  At the time of the report, Plaintiff was in fifth grade and was taking special education classes.  (Tr. 165).

2

In a February 24, 2009 daily activities report, Ms. Hurston indicated that Plaintiff spends his days attending school, watching television, and perhaps reading. (Tr. 153). Ms. Hurston reported that Plaintiff has some friends at school, but does not really play with friends outside of school. (*Id.*). He gets along well with his older sister, but not his younger sister. (*Id.*). When asked whether Plaintiff is expected to help with household chores, Ms. Hurston said "no," because "he never gets them done." (Tr. 154). Ms. Hurston indicated that Plaintiff is able to care for his personal needs "only if you call out each step." (*Id.*). When Plaintiff was younger, his speech was difficult to understand, but most of his speech can now be understood. (*Id.*). He is able to prepare food such as sandwiches or cereal on a weekly basis, but cannot fix food requiring mixing and cooking, set the table, write letters, dust or sweep, mow the lawn or shovel the snow, use public transportation, or make change for $5.00. (Tr. 155-56).

In an undated disability appeals report, Ms. Hurston reported that Plaintiff's condition had not changed since the time of his last report. (Tr. 188). However, he had received "IQ testing" at school in September of 2008. (Tr. 190).

### 2. *The November 4, 2010 Hearing Before the ALJ*

At the time of the November 4, 2010 hearing before the ALJ, Plaintiff was thirteen years old and was in seventh grade. (Tr. 39-40). He had been "held back" twice and, according to his mother, should have been in ninth grade at the time. (Tr. 40). Plaintiff was taking special education classes in all academic areas; however, he was still performing at a first or second grade level, and there was no expectation that he would ever catch up with his peers. (Tr. 40-41, 54-55). Plaintiff testified that he "sometimes" understands and is able to follow his teacher's instructions; however, he has difficulty following the teacher's rules. (Tr. 60-61). He does his homework "sometimes," but if he does not understand the assigned homework, he neither asks

3

for help nor wants to turn it in.  (Tr. 63).

Ms. Hurston testified that, at home, Plaintiff has difficulty with even the simplest tasks, such as hanging up his clothes, and becomes frustrated.  (Tr. 47).  Although she tries to help him with his homework, he becomes upset if he does not understand it.  (Tr. 48).  Often, he takes out his frustration on his younger sister, either by shoving her or yelling at her.  (*Id.*).  Ms. Hurston testified that she could not leave Plaintiff home alone because he is easily distracted, and she fears he will forget her instructions not to turn on the stove and start a fire.  (Tr. 50-51).  He can attend to his own personal hygiene only if his mother gives him very specific reminders at each step (i.e., take a shower, put on deodorant, brush your teeth).  (Tr. 52).  He does play outside with friends, although he does not play organized sports.  (Tr. 56).

At the time of the hearing, Plaintiff was seeing a counselor, who recommended that he be kept on a "schedule" or a "regimen."  (Tr. 49-50, 58).  As a result, Ms. Hurston had attempted to assign Plaintiff chores, such as washing dishes, although she had to directly supervise him to make sure he stayed on task and/or have him re-do a chore that was not done properly.  (Tr. 58).

### 3.    Medical Evidence

On April 7, 2009, a Childhood Disability Evaluation form was completed by state agency medical consultants Dr. Valorie Domino and Dr. S. Sood.  (Tr. 281-87).  Dr. Domino and Dr. Sood concluded that Plaintiff has "less than marked" limitations in acquiring and using information, attending and completing tasks, and health and physical well-being; and "no limitation" in interacting and relating with others, moving about and manipulating objects, and caring for himself.  (Tr. 283-84).

On August 13, 2009, Plaintiff saw Julie Lumeng, M.D., of the University of Michigan Health Center, for an intake evaluation and consultation regarding learning difficulties at school.  (Tr. 309-13).  At the time, Plaintiff was twelve years old and preparing to enter sixth grade.  (Tr.

4

309).   Ms. Hurston reported that Plaintiff often refused to go to school[2] because he was embarrassed or upset about his level of learning.  (Tr. 310).  However, she indicated he was easy to live with; seemed happy; enjoyed new experiences; was affectionate, friendly, and outgoing; played well with other children; shared and cooperated well with others; accepted rules easily; made friends easily; was forgiving; and recovered easily after disappointments.  (*Id.*).  During this evaluation, Plaintiff completed a series of academic skill screenings.  According to Dr. Lumeng:

> He was able to complete the majority of the tasks for the first grade level. However, he did not successfully complete more than half of the tasks for the second grade level.  According to the Goodenough-Harris Draw a Person Test, his drawing was age-appropriate for a 6-7 year old child.

(Tr. 312).  Further testing was recommended.  (*Id.*).

On October 8, 2009, Plaintiff saw Dr. Lumeng for an extended developmental assessment.  (Tr. 304-05).  Dr. Lumeng administered to Plaintiff the Wechsler Individual Achievement Test, Second Edition ("WIAT-II"), which measures a child's learned academic skills compared to other children of the same grade.  (Tr. 304).  The mean score on this test is 100, with a standard deviation of 15, meaning that the normal range for the test is between 70 and 130.  (*Id.*).  Plaintiff scored 45 in word reading (grade level 1.8), 62 in reading comprehension (grade level 1.0), 75 in numerical operations (grade level 3.8), and 85 in math reasoning (grade level 4.7).  (*Id.*).  Dr. Lumeng observed that Plaintiff "was engaged, attentive, and euthymic throughout the evaluation.  He was clearly putting forth his best effort.  He was not particularly fidgety."  (*Id.*).  Dr. Lumeng concluded that Plaintiff's test "scores were consistent with previous testing at school indicating a very significant language-based learning disability."  (*Id.*).  She further indicated that, as Plaintiff got older, "his reading impairment is likely to have

---

[2] Plaintiff's teacher also reported that his "family is experiencing homelessness which causes some attendance issues."  (Tr. 168).

an increasingly pervasive effect across academic subjects . . . . Consideration might be given to a self-contained classroom for children with significant learning disabilities." (*Id.*).

### 4.    School Records and Evaluations

#### a.    Teacher Questionnaire

A "teacher questionnaire" was completed in March of 2009 by Plaintiff's school counselor, Carla Freeman. (Tr. 168-75). Based on her observations, Ms. Freeman opined that Plaintiff has problems with acquiring and using information; specifically, Plaintiff has a "serious problem" understanding school and content vocabulary, reading and comprehending written material, expressing ideas in written form, and recalling and applying previously-learned material. (Tr. 169). In addition, Plaintiff has an "obvious problem" comprehending oral instructions, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, and learning new material. (*Id.*). Ms. Freeman also stated: "This child requires special instruction daily in both math & reading. He also requires occasional counseling services for self esteem issues." (*Id.*).

In the domain of attending and completing tasks, Ms. Freeman opined that Plaintiff has an "obvious problem" organizing his own things or school materials and working at a reasonable pace/finishing on time. (Tr. 170). In the domain of interacting and relating with others, Ms. Freeman indicated that Plaintiff has a "serious problem" with expressing anger appropriately and using adequate vocabulary and grammar, and an "obvious" problem with relating experiences and telling stories and taking turns in a conversation. (Tr. 171). She further indicated that Plaintiff needs "space to express himself." (*Id.*). Ms. Freeman indicated that she could understand almost all of Plaintiff's speech when the topic of conversation is known, but only 1/2 to 2/3 of his speech when the topic of conversation is unknown. (Tr. 172).

In the domain of caring for himself, Ms. Freeman opined that Plaintiff has a "serious" problem handling frustration appropriately, and an "obvious" problem identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and knowing when to ask for help. (Tr. 173). She indicated that Plaintiff needs "[t]ime out of class to work on expressing emotions" and that he "[w]ould benefit greatly from therapy." (*Id.*).

### b.    Other School Records

On September 18, 2008, Plaintiff was evaluated by psychologist Percy Bates, Ph.D. (Tr. 216-19). Dr. Bates noted that Plaintiff's teacher described him as "a very nice student but one with a low frustration tolerance level coupled with low self esteem, especially in reference to his academic ability." (Tr. 217). Dr. Bates administered several tests, including the Wechsler Intelligence Scale for Children – Third Edition ("WISC") and the Wide Range Achievement Test ("WRAT"). (Tr. 216). He noted that Plaintiff was very cooperative during the testing and seemed motivated to do well on the test.[3] (Tr. 217). Dr. Bates also noted:

> He was attentive to the test materials and did not seem to be easily distracted. This is in contrast to his classroom behavior where he is described as being easily distracted. However, the one-on-one in the testing provides less distraction than is the case in the classroom with a sizable number of students and additional opportunities for distraction.

(*Id.*). On the WRAT, Plaintiff scored below the first grade level on reading and spelling, and at the 1.9 grade level in arithmetic. (Tr. 216). On the WISC, Plaintiff's verbal IQ score was 73 (in the borderline range of intelligence), his performance IQ score was 93 (in the average range), and his full scale IQ score was 83 (in the low average range). (Tr. 217). Dr. Bates diagnosed Plaintiff with Specific Learning Disability. (Tr. 218). He recommended that Plaintiff be placed

---

[3] Dr. Bates also noted, however, that when he went to Plaintiff's classroom to pick him up for the testing, Plaintiff and several other students were being spoken to by the teacher. (Tr. 217). Upon exiting the classroom, Plaintiff was "very saddened and upset" about this conversation and "began to cry rather hard"; for some period of time, it appeared to Dr. Bates that he would not be able to conduct the testing. (*Id.*).

in a program that focuses on increasing his ability to understand, manipulate, and encode verbal symbols and materials, and further opined that Plaintiff would need "a great deal of guidance and support" to address his performance anxiety and low self-esteem, especially in the early stages of any remedial program.  (Tr. 218-19).

In an October 2008 Individualized Education Program ("IEP") Team Report, it was indicated that Plaintiff "is a cooperative student who struggles in most general education areas." (Tr. 195).  It was further noted that when the Woodcock-Johnson Achievement Test was administered to Plaintiff on September 22, 2008, he scored at the 1.8 grade level in broad reading, the 2.0 grade level in broad written language, and the 3.5 grade level in broad math (Plaintiff was in fifth grade at the time).  (Tr. 194, 196).  In summary, the test examiner stated: "[Plaintiff's] ability to apply academic skills is within the low average range of others at his grade level.  His fluency with academic tasks is low.  His academic skills are very low."  (Tr. 233).  Pursuant to this IEP, Plaintiff began receiving 1.5 hours of special education in each 32.5 hour school week.  (Tr. 202).

In April of 2010, an updated IEP was completed for Plaintiff, who was then in the sixth grade.  (Tr. 325-37).  Since the implementation of Plaintiff's prior IEP (in October of 2008), he had "not made much progress toward his reading goal" and continued to read "around the early first grade level."  (Tr. 326).  Specifically, the IEP states:  "He is able to read words in isolation and able to read and understand short phrases.  However, when asked to read a paragraph and answer comprehension questions, he was unable to answer any correctly."  (*Id.*).  With respect to Plaintiff's math ability, the IEP states:  "He continues to work around the mid-third grade level. He was able to add and subtract with and without regrouping.  He could solve simple multiplication problems if he set them up as long addition problems.  He was unable to calculate

8

any division problems.  He was good at solving mental math problems." (*Id.*).  In addition, Plaintiff was writing at a mid-second grade level. (*Id.*).  The IEP states: "… it is very difficult to read and edit his writing as his word structure is very hard to decode.  He has his own spelling language, which might be phonetic based but is very difficult to translate.  Once translated, he does have good sentence structure but struggles with verb agreement." (*Id.*).  The IEP provided that Plaintiff be allowed additional time on tests and assignments; have directions and materials read to him for tests, texts, and assignments; and have modified and/or reduced tests and assignments.  (Tr. 332).  In addition, Plaintiff was to receive 60-120 minutes per day, five days a week, of special education services through the Resource Program.  (*Id.*).

The record also contains a Discipline Referral Form, dated October 28, 2010, indicating that Plaintiff received an in-school suspension for "Defiance/Disrespect/Non-compliance (back talk)" when he refused to put his feet under a desk during a test.  (Tr. 338).

### C.      Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(C)(i).  The Social Security regulations set forth a sequential three-step process for determining children's disability claims:  first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *See* 20 C.F.R. §416.924(a).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of

the impairment.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children."  *Id.*  Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the listing.  *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment does not "meet" a listed impairment, the impairment may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment.  *See* 20 C.F.R. §416.926a.  "Medical equivalency is covered by 20 C.F.R. §416.926; functional equivalency is covered by Section 416.926a."  *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment."  *Walls v. Comm'r of Soc. Sec.*, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. §416.926(a)).  A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;

> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or

> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

10

*Evans ex rel. DCB v. Comm'r of Soc. Sec.*, 2012 WL 3112415, at *6 (E.D. Mich. Mar. 21, 2012) (quoting *Koepp v. Astrue*, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011)); *see also* 20 C.F.R. §416.926.  "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability.  If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance."  *Evans*, 2012 WL 3112415, at *7 (quoting *Emeonye v. Astrue*, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008)).

Regarding functional equivalence, there are six "domains" that an ALJ considers:  (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  *See* 20 C.F.R. §416.926a.  Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations in two of the six.  *See* 20 C.F.R. §416.926a(d).  An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(3)(i).  A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(2)(i).

### D.      The ALJ's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 12, 2009, the application date.  (Tr. 15).  At step two, the ALJ found that Plaintiff has the following severe impairments:  asthma and learning disability.  (*Id.*).  At step three, the

ALJ concluded that these impairments do not meet or medically equal a listed impairment.  (*Id.*).
The ALJ also found that Plaintiff's impairments do not functionally equal any listing because he
has less than marked limitations in the domains of acquiring and using information and attending
and completing tasks, and no limitations in the remaining domains.  (Tr. 18-25).

###    E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative
decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the
court "must affirm the Commissioner's conclusions absent a determination that the
Commissioner has failed to apply the correct legal standard or has made findings of fact
unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d
591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d
647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not
remand for further administrative proceedings unless the claimant has been prejudiced on the
merits or deprived of substantial rights because of the agency's procedural lapses.") (internal
quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a
preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to
support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)
(internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's
decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide
questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d
at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of
witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13;
*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may
look to any evidence in the record, regardless of whether it has been cited by the Appeals
Council," or in this case, the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.
2001); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is
no requirement, however, that either the ALJ or this court discuss every piece of evidence in the
administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir.
2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision
every piece of evidence submitted by a party.") (internal quotations omitted).   If the
Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the
reviewing court would decide the matter differently and even if substantial evidence also
supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286
(6th Cir. 1994) (internal citations omitted).

> **F.   Analysis**
>
> > *1.    The ALJ's Functional Equivalence Analysis
> > Is Not Supported by Substantial Evidence in
> > Three of Four Domains*

As set forth above, the ALJ determined that Plaintiff's impairments do not functionally
equal a listing.  (Tr. 18-25).  In order to establish functional equivalence, Plaintiff must show
"marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.
*See* 20 C.F.R. §416.926a(d).  In order for a limitation to be considered marked, the child's
impairments must interfere "seriously" with his ability to independently initiate, sustain, or
complete activities.   *See* 20 C.F.R.  §416.926a(e)(2)(i).   A marked limitation also means a
limitation that is "more than moderate" but "less than extreme."  *Id.*  In order for a limitation to
be considered extreme, the child's impairments must interfere "very seriously" with the ability to

13

independently initiate, sustain, or complete activities.  *See* 20 C.F.R. §416.926a(e)(3)(i).  An extreme limitation is the rating given to "the worst limitations."  *Id.*

After reviewing the medical and other record evidence, reports, and hearing testimony, the ALJ found that Plaintiff has "less than marked" limitations in the domains of acquiring and using information and attending and completing tasks.  (Tr. 18-21).  The ALJ found no limitation in the domains of interacting and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being.  (Tr. 21-25).  Plaintiff challenges the ALJ's findings with respect to four domains:  acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself.  (Doc. #12 at 8-15).

> a.     *Remand is Required Because, in Finding that Plaintiff*
> *Has a Less Than Marked Limitation In Acquiring and*
> *Using Information, the ALJ Erred in Failing to*
> *Properly Consider Certain of Plaintiff's Test Scores and*
> *Other Evidence in the Record*

The domain of acquiring and using information addresses how well a child acquires or learns information, and how well he uses the information he has learned.  *See* 20 C.F.R. §416.926a(g).  An adolescent[4] (age 12 to attainment of age 18) should (1) continue to demonstrate in middle school and high school what he has learned in academic assignments; (2) be able to use what he has learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation); (3) be able to comprehend and express both simple and complex ideas, using increasingly complex language, in learning and daily living situations; and (4) apply these skills in practical ways that will help in entering the workplace after school is finished.  *See* 20 C.F.R. §416.926a(g)(2)(v).  Examples of limited

---

[4] Although Plaintiff was a "school-age child" at the time his application was filed, he turned twelve and, therefore, became an "adolescent" within the meaning of the regulations less than one month later, which was well prior to the ALJ's decision.  Therefore, the court will analyze Plaintiff's abilities in this domain under the standards applicable to adolescents.

functioning in this domain include difficulty recalling important things learned in school previously; difficulty solving math problems; or talking only in short, simple sentences, with difficulty explaining what is meant.  *See* 20 C.F.R. §416.926a(g)(3).  School records are a significant source of information about limitations in this domain, so evidence of poor grades, inconsistent academic performance, and/or special education services indicates a limitation in this domain.  *See Soc. Sec. Rul.* 09-3p, 2009 WL 396025, at *3 (Feb. 17, 2009).

In concluding that Plaintiff has a "less than marked" limitation in the domain of acquiring and using information, the ALJ specifically said, "…while [Plaintiff's] WISC scores were in the low-average range, they were not more than two standard deviations below the mean scores … which might indicate a 'marked' limitation."  (Tr. 19 (citing Tr. 304)).  As Plaintiff points out in his motion, the evidence cited by the ALJ in support of this statement is actually a report from Dr. Lumeng, indicating Plaintiff's scores on the Wechsler Individual Achievement Test, Second Edition (WIAT-II), not the Wechsler Intelligence Scale for Children (WISC).  (Doc. #12 at 9).  And, critically, as the Commissioner concedes, the ALJ clearly erred in his discussion of Plaintiff's tests results, though the impact of that error is subject to debate.  (Doc. #17 at 15).

The mean score on the WIAT-II is 100, with a standard deviation of 15, meaning that the normal range for the test is between 70 and 130.  (Tr. 304).  *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00D(6)(c) (explaining that the Wechsler series tests have a mean of 100 and a standard deviation of 15); *Brown ex rel. T.H. v. Astrue*, 2009 WL 2923062, at *2 (E.D.Mo. Sept. 8, 2009) (explaining that the WIAT–II has "a standard deviation of 15 and a mean of 100").  As set forth above, Plaintiff scored 45 in word reading, 62 in reading comprehension, 75 in numerical operations, and 85 in math reasoning.  (*Id.*).  Looking strictly at Plaintiff's test scores, then, he tested more than three standard deviations below the mean in word reading, more than

two standard deviations below the mean in reading comprehension, and less than two standard deviations below the mean in numerical operations and math reasoning.  (*Id.*).

The applicable regulations provide that "… we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score."  20 C.F.R. §416.926a(e)(2)(iii).  The regulations further provide that "… we will find that you have an 'extreme' limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score."  20 C.F.R. §416.926a(e)(3)(iii).  According to Plaintiff, then, his test scores support a finding of an "extreme" limitation in acquiring and using information, or – at a minimum – a "marked" limitation in that domain. (Doc. #12 at 10).

As an initial matter, there is some disagreement as to the significance of Plaintiff's scores on the four WIAT-II subtests.  Plaintiff suggests that his score on the word reading subtest alone, which was more than three standard deviations below the mean, evidences an extreme limitation in acquiring and using information.  (Doc. #12 at 10).  The Commissioner, on the other hand, averages Plaintiff's scores on the four WIAT-II subtests and then argues that Plaintiff's "comprehensive score" on the WIAT-II was 66.75, which is more than two (but less than three) standard deviations below the mean.  (Doc. #17 at 15).  As a result, argues the Commissioner, Plaintiff's purported "comprehensive score on the WIAT test" demonstrates not more than a marked limitation in the domain of acquiring and using information.  (*Id.* at 16).  According to

16

the Commissioner, then, any error committed by the ALJ in misinterpreting Plaintiff's scores on this test was harmless because "the score indicates at most a marked limitation in only one domain." (*Id.*). The Commissioner's harmless error argument fails for two reasons.

To begin with, the Court notes that the record does not contain evidence of Plaintiff's "composite scores" in any of the four composite areas typically tested by the WIAT-II (reading, mathematics, written language, or oral language).[5] Rather, the record merely indicates Plaintiff's scores on four specific subtests: word reading and reading comprehension (part of the "reading" composite area), and numerical operations and math reasoning (part of the "mathematics" composite area). The Commissioner has offered no support for her argument that Plaintiff's four subtest scores should be averaged to produce a "comprehensive" score, or that the approach suggested by Plaintiff is inappropriate.

While determining the appropriate methodology for analyzing Plaintiff's "composite" scores is the ALJ's task, it is at least plausible that Plaintiff's reading subtest scores alone could support an "extreme," or at least "marked," limitation in acquiring and using information. The Court notes that the ALJ himself appeared to focus not on an overall average score, but on Plaintiff's ***individual*** WIAT-II[6] "scores" when he wrote, "while his WISC [sic] scores were in the low-average range, they were not more than two standard deviations below the mean scores…" (Tr. 19). But, this finding was erroneous, as Plaintiff's word reading score of 45 was more than three standard deviations below the mean, and his reading comprehension score of 62 was more than two standard deviations below the mean. Moreover, where the instant record

---

[5] *See*   http://www.pearsonassessments.com/hai/Images/pdf/sample_reports/WISC-IV--WIAT-II%20Interpretive%20Parent.pdf.

[6] Again, although the ALJ references "WISC" scores, the page he cites for those scores – Exhibit 4F at page 17 – relates to Plaintiff's WIAT-II scores. (Tr. 19, 304).

contains no specific "composite" scores, the ALJ may have found it appropriate to average and give weight to Plaintiff's WIAT-II scores on the reading subtests and, separately, average Plaintiff's scores on the mathematics subtests in order to provide more accurate composite scores in each of these areas. *See, e.g., Tobar v. Astrue*, 2012 WL 4936111, at *1 (E.D. Mo. Oct. 17, 2012) (referencing separate "reading composite," "mathematics composite," and "writing composite" scores on the WIAT-II test); *Van Valkenberg ex rel. B.G. v. Astrue*, 2010 WL 2400455, at *9 (N.D.N.Y. May 27, 2010) (distinguishing between claimant's "reading composite and the subtest[]" scores).   Applying this methodology, Plaintiff's reading composite score would be 53.5 (more than three standard deviations below the mean), and his mathematics composite score would be 80 (less than two standard deviations below the mean).   In this case, then, Plaintiff would have a "valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain," and he would have established the existence of an extreme limitation.  *See* 20 C.F.R. §416.926a(e)(3)(iii).   Or, if the scores are deemed to show "marked" limitations in this domain, Plaintiff could prevail by establishing that he is similarly limited in one of the other domains.   As discussed below, he still may be able to do so here.  *See* 20 C.F.R. §416.926a(d).

Moreover, the applicable regulations provide that an "extreme" limitation *will be found* "when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test…."   20 C.F.R.  §416.926a(e)(3)(iii) (emphasis added).   They also note that a marked limitation "is the equivalent of functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."   20 C.F.R. §416.926a(e)(2).   Thus, the regulations do not provide that a particular score *must* be present in order to find an extreme or marked limitation.   Indeed, the

regulations specifically provide that "[w]e may find that you have a 'marked' or 'extreme' limitation when you have a test score that is slightly higher than the [requisite] level" if other information in the record supports such a finding. 20 C.F.R. §416.926a(e)(4)(ii)(A). Thus, even if the Plaintiff's WIAT-II subtest scores alone do not compel a finding of an extreme limitation in the domain of acquiring and using information, it is possible that these scores are suggestive of such a finding, particularly when considered in light of the other evidence of Plaintiff's difficulties in this domain.

For example, Plaintiff's mother testified that he had been "held back" twice. (Tr. 40). And, on the WIAT-II, Plaintiff (then 12 years old), scored at grade level 1.8 on word reading 1.0 on reading comprehension, 3.8 on numerical operations, and 4.7 on math reasoning. (Tr. 304). Dr. Lumeng opined that Plaintiff's "scores were consistent with previous testing at school indicating a very significant language-based learning disability" and that, as he gets older, "his reading impairment is likely to have an increasingly pervasive effect across academic subjects." (*Id.*). At a series of academic skill screenings administered by Dr. Lumeng in August of 2009 (when Plaintiff was still 12 years old), Plaintiff was unable to successfully complete more than half of the tasks *for the second grade level*. (Tr. 312). On the WISC, Plaintiff's verbal IQ score was 73 (in the borderline range of intelligence), his performance IQ score was 93 (in the average range), and his full scale IQ score was 83 (in the low average range). (Tr. 217). On the WRAT, administered to Plaintiff when he was almost 12 years old, Plaintiff scored *below the first grade level in reading and writing*, and at the 1.9 grade level in arithmetic. (Tr. 216). And, on the Woodcock-Johnson Achievement Test, which was administered to Plaintiff around the same time, he scored at the 1.8 grade level in broad reading, the 2.0 grade level in broad written language, and the 3.5 grade level in broad math (Plaintiff was in fifth grade at the time). (Tr.

19

194, 196).

In summary, even if Plaintiff's WIAT-II scores alone do not *require* a finding of an extreme or marked limitation in the domain of acquiring and using information, there is ample evidence in the record which, viewed in conjunction with these test scores, suggest the existence of such a limitation. This conclusion is bolstered by the fact that in his discussion of Plaintiff's limitations in this domain, the ALJ failed to address numerous significant pieces of evidence, the omission of which unfairly skewed his analysis.[7] For instance, in concluding that Plaintiff was only mildly limited in this domain, the ALJ, citing to the April 210 EIP, stated:

> Although Claimant has difficulty in verbal areas of reading and writing and mild difficulties in math at the sixth grade level, he is able to read and understand phrases, add and subtract without regrouping, solve multiplication problems, do mental math problems, and structure sentences well despite poor spelling and verb agreement.

(Tr. 19 (citing Tr. 326)). A full reading of the IEP, however, reveals that Plaintiff has far greater limitations in reading, math, and writing than suggested by the ALJ's analysis. (Doc. #12 at 8-9). With respect to Plaintiff's reading abilities, the April 2010 IEP cited by the ALJ actually

---

[7] The Court recognizes that "an ALJ is not required to discuss all of the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (Doc. #17 at 14) (citing *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) and *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)). Indeed, under the deferential "substantial evidence" standard, an ALJ need not support his findings with a preponderance of the evidence. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). However, a substantiality of evidence evaluation does not permit a selective reading of the record. *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). *See also Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000) (substantial evidence "cannot be based on fragments of the record"). In other words, where an ALJ's decision discusses only the record evidence which supports his conclusion, while failing to discuss or explain away *significant* contrary pieces of evidence, that conclusion is not supported by "substantial evidence." *See Walker v. Comm'r of Soc. Sec.*, 2013 WL 2393178, at *13 (E.D. Mich. May 31, 2013); *see also Mukes v. Comm'r of Soc. Sec.*, 2013 WL 2179325, at *9 (S.D. Ohio May 20, 2013) (ALJ erred in failing to consider all relevant evidence and instead relying only on evidence supporting her final conclusion).

states that Plaintiff (then a sixth-grader who had been held back twice) continued to read "around the early first grade level." (Tr. 326). In addition, the IEP states: "He is able to read words in isolation and able to read and understand short phrases. However, when asked to read a paragraph and answer comprehension questions, he was unable to answer any correctly." (*Id.*). The ALJ's finding that Plaintiff "has difficulty in verbal areas of reading and writing" leaves the reader with a significant misimpression about his level of impairment.

Similarly, with respect to Plaintiff's math ability, the ALJ found that Plaintiff can "add and subtract without regrouping, solve multiplication problems, [and] do mental math problems." (Tr. 19 (citing Tr. 326)). What the IEP actually states, however, is that Plaintiff – who, again, was then in the sixth grade – "continues to work around the mid-third grade level" and was "unable to calculate and solve grade level math problems." (Tr. 326).

And, with respect to Plaintiff's writing, the ALJ apparently noted as a positive the fact that Plaintiff can "structure sentences well despite poor spelling and verb agreement." (Tr. 19 (citing Tr. 326)). Again, however, a fair reading of the entire document referenced by the ALJ reveals that Plaintiff was writing only at a mid-second grade level. (*Id.*). Specifically, the IEP states: "… it is very difficult to read and edit his writing as his word structure is very hard to decode. He has his own spelling language, which might be phonetic based but is very difficult to translate …. [He] is working more than two grade levels below his peers." (*Id.*). These are but a few examples[8] of the way in which the ALJ extracted words or phrases from a document while

_____

[8] In finding Plaintiff to have a less than marked limitation in this domain, the ALJ also relied on a statement made by Plaintiff's teacher, Carla Freeman, indicating "that she can understand his speech almost all of the time on the first attempt." (Tr. 19 (citing Tr. 172)). This mischaracterizes Ms. Freeman's opinion, however, as she indicated she can understand Plaintiff's speech almost all of the time *when the topic of conversation is known*, but only 1/2 to 1/3 of his speech when the topic of conversation is unknown. (Tr. 172). Likewise, the ALJ buttressed his conclusion regarding Plaintiff's limitations in this domain by stating that Plaintiff

failing to mention those statements contained within the same document that belied his conclusion.

For all of the above reasons, it is conceivable that a more complete analysis of Plaintiff's WIAT-II test scores and other record evidence, could result in a finding that he is either extremely or markedly limited in the domain of acquiring and using information. Accordingly, the Court cannot conclude the ALJ's error was harmless, and therefore remand is appropriate for further consideration of the above matters.

> **b.** *In Evaluating Plaintiff's Limitations in the Domain of Attending and Completing Tasks, the ALJ's Decision is Supported by Substantial Evidence*

The Court rejects Plaintiff's argument that the ALJ erred in finding that he has a less than marked limitation in the domain of attending and completing tasks. (Tr. 20). The ALJ noted that "every clinician who administered formal testing to [Plaintiff] noted that he was cooperative and did not appear to be easily distractable." The record supports this finding. For instance, with respect to his WIAT-II test, Dr. Lumeng observed that Plaintiff "was engaged, attentive, and euthymic throughout the evaluation. He was clearly putting forth his best effort. He was not particularly fidgety." (Tr. 304). The ALJ noted that "[Plaintiff's] teacher also observed that [he] appeared to work on assignments during independent work time…" (Tr. 20). The record supports this finding as well. In the portion of the Teacher Questionnaire dealing with Attending

---

"receives only 10 hours at most of special education or resource room programs in a school week." (Tr. 19). But the ALJ failed to discuss a significant amount of contrary record evidence, including the fact that Plaintiff has been held back twice in school; he is allowed additional time on tests and assignments; he has directions and materials read to him orally on tests, texts, and assignments; his tests and assignments are modified and/or reduced; and Dr. Lumeng recommended that consideration be given to placing Plaintiff in a self-contained classroom for children with significant learning disabilities. (Tr. 40, 304, 332). These are highly relevant considerations in determining the extent of a child's limitations in the domain of acquiring and using information. *See Soc. Sec. Rul.* 09-3p, 2009 WL 396025, at *3 (Feb. 17, 2009).

and Completing Tasks, Plaintiff's teacher, Ms. Freeman, rated him in 13 activities.  She noted that he had "no problem" with 11 of them, including "paying attention when spoken to directly," "focusing long enough to finish assigned activity or task," "refocusing to task when necessary," and "carrying out multi-step instructions."  (Tr. 170).   The two activities where Ms. Freeman found him to be suffering from an "obvious problem" – organizing his things/school materials and working at a reasonable pace – do not negate this substantial evidence.  (*Id.*).  The ALJ also relied on a form completed by Ms. Hurston (Plaintiff's mother) which purportedly contradicted her hearing testimony that Plaintiff "requires constant supervision and re-direction doing chores to keep him on task."  (Tr. 20).  Specifically, the ALJ referred to Ms. Hurston's statement on a February 2009 Daily Activities form that Plaintiff was able to prepare food (such as sandwiches and cereal) on a weekly basis and do so "well."  (Tr. 20 (citing Tr. 155)).  Ms. Hurston also indicated, however, that Plaintiff requires "a lot" of supervision because he does not finish tasks and that she does not assign him chores because he never finishes them.  (Tr. 154).  Again, this evidence does not negate the substantial evidence above, which comes from more objective parties.  *Cutlip,* 25 F.3d at 286.

> c.   *In Evaluating Plaintiff's Limitations in the Domains of Interacting and Relating with Others and Caring for Himself, the ALJ's Findings Are Not Supported by Substantial Evidence*

The ALJ's findings that Plaintiff has no limitation in the domains of interacting and relating with others and caring for himself are not supported by substantial evidence.

With respect to interacting and relating with others, the ALJ relied on statements made by Plaintiff's teacher, Ms. Freeman, that Plaintiff had "no problem" "playing cooperatively with other children," "making and keeping friends," "seeking attention appropriately," "following rules," "respecting/obeying adults in authority," or "introducing and maintaining relevant and

appropriate topics of conversation." (Tr. 22 (citing Tr. 171)). Additionally, the ALJ cited Ms. Hurston's statements to Dr. Lumeng that Plaintiff was "easy to live with, seems happy, enjoys new experiences, is affectionate, friendly, and outgoing, plays well with other children, shares and cooperates well with others, accepts rules easily, makes friends easily." (Tr. 22 (citing Tr. 310).

While the foregoing evidence supports the ALJ's conclusion, it does not amount to "substantial evidence" here because the ALJ failed to weigh or explain significant contrary evidence which could show that Plaintiff has marked limitations in this domain. *See supra*, fn. 7. Specifically, on the very page of the Teacher Questionnaire cited by the ALJ to support his conclusion that Plaintiff has *no limitation* in this domain, Ms. Freeman opined that Plaintiff has a "serious problem" expressing anger appropriately and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (Tr. 171). Ms. Freeman also indicated that Plaintiff has an "obvious problem" in relating experiences and telling stories and taking turns in a conversation. (*Id.*). Though the ALJ recognized that those are all indicia of serious limitations in the domain of interacting and relating with others, his actual analysis of the record failed to take them into account. (Tr. 21) (citing 20 CFR 416.926a(i)(2)(v) and SSR 09-5p).[9] While the ALJ may well conclude that the evidence of Plaintiff's problem areas is outweighed by the evidence of his capabilities, the resolution of that conflict is not so apparent that the Court can find that the ALJ's failure to address it was mere harmless error. *Supra*, fn. 7.

Similarly, in concluding that Plaintiff has no limitation in caring for himself, the ALJ failed to address important contrary evidence in the record. For example, in support of this finding, the ALJ said that Plaintiff "is able to correctly prepare food for himself," "is not

---

[9] The ALJ also noted that the child "should be able to … ask for assistance" when necessary, *id.*, yet the record indicates that Plaintiff has trouble knowing when or how to do so. (Tr. 63, 173).

expected to do chores," and is able to attend to his personal care "though his mother does ask to make sure he does such things as putting on deodorant or changing his socks." (Tr. 24). The evidence actually shows, however, that although Plaintiff can prepare a sandwich or cereal for himself, he requires "a lot" of supervision. (Tr. 154-55). Similarly, on the same form in which Ms. Hurston indicated that Plaintiff does not have any chores, she indicated that this was because "he never gets them done." (Tr. 154). Ms. Hurston also testified that Plaintiff can attend to his own personal hygiene *only if she gives him very specific reminders at each step* (i.e., take a shower, put on deodorant, brush your teeth). (Tr. 52). Moreover, the ALJ failed to note Ms. Freeman's opinion that Plaintiff has a serious problem handling frustration appropriately and "would benefit greatly from therapy." (Tr. 173). Again, while the ALJ need not address each and every piece of evidence in the record, he is required to discuss significant evidence that fairly detracts from his conclusion. *Supra* fn. 7. Since the ALJ failed to do that here, his conclusion is not supported by substantial evidence, *id.*, and the Court recommends that he revisit the issue on remand.

> 2.     *On Remand, the ALJ Should Reconsider the Amount of Weight to Be Given the State Agency Consultants' Childhood Disability Evaluation*

Plaintiff also argues that the ALJ erred in giving "significant weight" to the Child Disability Evaluation completed by state agency medical consultants Dr. Valorie Domino and Dr. S. Sood. (Doc. #12 at 15). Specifically, Plaintiff asserts that because the consultants completed the evaluation in April of 2009, they necessarily did not review any records subsequently generated, including Plaintiff's October 2009 test results from Dr. Lumeng and his April 2010 IEP, in forming their opinion as to Plaintiff's limitations. (*Id.*). As a result, Plaintiff argues that the ALJ's decision to give significant weight to the opinion of these consultants is not supported by substantial evidence. (*Id.*).

Although there is no categorical requirement that a non-treating source's opinion be based on a "complete" record, courts have recognized that, under certain circumstances, it is error for the ALJ to accord significant weight to a "stale" opinion of a non-treating source. *See, e.g., Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408-09 (6th Cir. 2009); *Blanchard v. Comm'r of Soc. Sec.*, 2012 WL 1453970, at *18 (E.D. Mich. Mar. 16, 2012); *Garber v. Astrue*, 2012 WL 1069017, at *10 (N.D.N.Y. Mar. 2, 2012) ("It is true that stale, conclusory reports of state agency officials based upon incomplete medical records may not constitute substantial evidence). In this case, while the ALJ's decision to give the state agency consultants' opinion significant weight might not, standing alone, constitute reversible error, the court suggests that, on remand, the ALJ reconsider the weight accorded this opinion in light of the fact that it was formed without the benefit of review of certain more recent and critical medical and school records.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be DENIED, Plaintiff's Motion for Summary Judgment [12] be GRANTED IN PART, the ALJ's decision be REVERSED, and this case be REMANDED for further proceedings consistent with this Report and Recommendation.


Dated: June 27, 2013                                       s/David R. Grand
Ann Arbor, Michigan                                  DAVID R. GRAND
                                                                      United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).   Failure to file specific

objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 27, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager